IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

NEWCOM HOLDINGS PTY. LTD.        )
                                 )
        Plaintiff,               )
                                 )
        v.                       )    1:04cv136 (LMB)
                                 )
IMBROS CORP.                     )____
(f/k/a Funge Merger Corp.)       )
                                 )
        Defendant.               )


<u>MEMORANDUM OPINION</u>


        Before the Court are the parties' motions for summary
judgment.  At oral argument, the parties agreed that the
evidentiary record was fully developed and that trial would not
assist in the decisional process.  The Court therefore cancelled
the scheduled bench trial and took the motions under advisement.

        In its complaint, plaintiff alleges that it possesses an
interest in a patent application that defendant purchased from a
third party in a 2002 bankruptcy sale.  Plaintiff argues that in
the fall of 2000 it attached a permanent residual equitable
interest to the patent application, which it then owned, before
transferring legal title to the application to a company
affiliated with plaintiff.  Title to the application was
subsequently transferred once more to a second company affiliated
with the plaintiff.  Defendant purchased the application in April
2002 when the second company went into bankruptcy and its assets

were sold.  On the basis of its alleged residual interest, plaintiff seeks an order reconveying the patent at issue.

Defendant argues that the document upon which plaintiff premises its claim is so poorly drafted and non-specific that it is unenforceable.  Defendant also claims that it was a good faith purchaser who bought all rights to the patent application free and clear of any lien or cloud on the application's title during the trustee's sale.  Lastly, defendant asserts that plaintiff is barred from raising its claim to this property under the doctrines of <u>res judicata</u>, waiver and equitable estoppel.[1]

The Court finds overwhelming merit in all of defendant's arguments.  Accordingly, for the reasons discussed below, summary judgment will be entered in defendant's favor.

## FACTUAL BACKGROUND

The plaintiff, Newcom Holdings Pty. Ltd. ("Newcom"), is a privately owned Australian company.  Keith Benson, a substantial shareholder of Newcom who has served as its director and chief operating officer, invented and patented a variety of technologies for use in the mobile commerce industry.  In the fall of 1999, Newcom and Benson moved to transfer ownership of intellectual property they owned to avoid or minimize their

---

[1] Defendant raises several other arguments that the Court has not addressed, as the major arguments the Court identified are more than sufficient to establish that summary judgment in defendant's favor is warranted.

Australian taxes and to exploit business opportunities in the
United States.  To implement these goals, in September 1999,
Benson and Newcom established Funge Systems International Ltd.
("FSIL"), a company incorporated in the Cayman Islands and
controlled by Newcom and Benson.  In December 1999, Newcom formed
a second entity, Funge Systems, Inc. ("FSI"), which was
incorporated in Delaware.  Newcom retained control of FSI by
making FSIL the majority shareholder of FSI.  To execute its
business plan, FSI had to raise $15 million in capital; in 2000,
it succeeded in raising nearly $12 million from third-party
investors, who collectively obtained 19% of FSI's common stock.
Benson Dep. at 41.

   FSI's primary assets of relevance to this litigation were
two patent applications transferred to it by Newcom.  The first
was Patent Application No. 08/782,244, which was filed on January
14, 1997, with the United States Patent and Trademark Office
("PTO") for a mobile commerce technology called Card-Switch.[2]  It
is not clear from the record when Card-Switch was transferred to
FSI.[3]  The second patent application, No. 09/594,016, which is
the subject of this litigation, was filed by Benson with the PTO

---

[2] The Card-Switch application issued on September 18, 2001,
as U.S. Patent 6,292,561.

[3] Language in the Deed of Rectification and Variation, see
infra, suggests that Card-Switch was transferred before August
2000.

on June 15, 2000.  This second patent was for the V-SIM accessory,[4] a device that can enable mobile phones to conduct mobile commerce transactions.  This asset was ultimately transferred to FSI on October 6, 2000, after a series of assignments from Benson to Newcom to FSIL to FSI.

Newcom and its affiliates executed, drafted or contemplated several agreements to control the transfer of intellectual property to FSI and thereby avoid tax liabilities.  To transfer the Card-Switch technology, Keith Benson signed a document titled the Principal Agreement on behalf of both parties to the agreement, Newcom and FSI.  In this undated document, Newcom agreed to convey Card-Switch and other rights to FSI pursuant to a yet undrafted Transfer Down Agreement.  No copy of this Transfer Down Agreement between Newcom and FSI has been proffered to the Court and no reliable evidence has been presented to establish that this document was ever drafted or executed.  Under this purported transfer, FSI agreed to pay Newcom for Card-Switch and to enter into two agreements with FSIL: a Processing Agreement and a separate Transfer Down Agreement (the "FSIL Transfer Down Agreement").  In the Processing Agreement, FSIL agreed to provide certain services to FSI.  Although this

---

[4] Although this application eventually led to the issuance on June 8, 2004, of U.S. Patent No. 6,747,547, this Opinion will refer to V-SIM as a patent application because that was the status of the intellectual property during the time period relevant to this litigation.

agreement was executed, it was never implemented.  In the FSIL

Transfer Down Agreement, FSIL agreed to transfer to FSI "good,

valid and marketable title" to pending U.S. patent applications

it owned in exchange for a two million dollar promissory note.

The patent applications being transferred were to be listed on

Schedule 2.1(a) of the agreement; however, this schedule was

never created.

Sometime during the summer of 2000, Newcom, Newcom

Technologies,[5] FSI, and FSIL drafted an agreement titled the Deed

of Rectification and Variation ("Deed of Rectification" or

"DRV").  The Deed of Rectification contains no dates indicating

when it became effective, and none of the signatures are dated.

However, Benson has stated in a declaration that the Deed of

Rectification was executed "some time shortly after August 16,

2000."  Benson Decl. at ¶ 16.  The purpose of the Deed of

Rectification was to clarify the structure of subsequent

transfers of intellectual property to FSI and the resulting

ownership of intellectual property assets, given the failure of

the parties to execute two key elements of the Principal

_____

[5]  Newcom Technologies was a wholly-owned subsidiary of
Newcom and, for purposes of this decision, is treated as
indistinguishable from Newcom.  Therefore, although defendant
argues that there is confusion as to who is the true party to the
Deed of Rectification, given its references to "Newcom," "Newcom
Holdings Pty. Ltd." and "Newcom Technologies Pty. Ltd.," this
confusion does not make a material difference to the Court's
analysis.  Plaintiff will be referred to as "Newcom" throughout
this Opinion.

Agreement: the Transfer Down Agreement and Schedule 2.1(a) of the FSIL Transfer Down Agreement.[6]

Under the specific terms of the Deed of Rectification, Newcom agreed to convey to FSI "the whole of [its] interests from time to time . . . in all Non-US Patents and Subsequent Developments[.]"  DRV, Section 3.1 (emphasis added).  Recital E(iii) of the DRV defined a "Subsequent Development" in relevant part as "any patent application related to any improvement or subsequent development concerning any claim contained in the US Pending Patent Application[.]"  The Deed of Rectification explicitly mentioned only one pending United States patent application -- the Card-Switch application -- even though the V-SIM patent application was pending at the time the Deed of Rectification was purportedly signed in late August 2000.  In return for Newcom's transfer of intellectual property rights to FSI, FSI agreed to:

> hold and stand possessed of that Non-US Patent or that Subsequent Development (as the case may be) as bare trustee for FSIL as sole beneficial owner thereof free from all Encumbrances (other than the provisions of Sub-clause 3.2.2) **IF** Funge Inc [FSI] agrees to grant to Newcom a Non-Exclusive Licence of that Non-US Patent and Subsequent Development[.]

DRV, Section 3.2.1 (emphasis in original).  In Section 3.2.2, FSI agreed to reconvey to Newcom legal title to Subsequent

---

[6] As Newcom had transferred the Card-Switch application to FSI when the Deed of Rectification was drafted, the Deed apparently did not affect FSI's ownership of Card-Switch.

Developments upon demand if:

    3.2.2.1.        in respect of that Non-US Patent or Subsequent Development Newcom wishes either to:

        3.2.2.1.1.    grant to another person an exclusive licence; or

        3.2.2.1.2.    undertake for itself to exploit the benefit of that Non-US Patent or Subsequent Development in any jurisdiction other than a jurisdiction in respect of which Funge Inc. has previously acquired the beneficial ownership of the Non-US Patent or Subsequent Development;

    3.2.2.2. either:

        3.2.2.2.1.    Funge Inc. does not wish to obtain a licence in respect of that Non-US Patent or Subsequent Development; or

        3.2.2.2.2.    Newcom and Funge Inc. do not enter into any licence agreement in respect of that Non-US Patent or Subsequent Development after undertaking good faith negotiations as contemplated in Sub-clauses **2.2(a)** and **2.2(b)** of the Newcom Transfer Down Agreement to do so

        as the case may be; and

    3.2.2.3.  the Processing Agreement has terminated

    3.2.2.4.  FSIL has granted to Newcom the Non-Exclusive Licence

free from all Encumbrances[.][7]

---

[7] To demonstrate the extremely unclear manner in which the Deed was written, when this Opinion quotes from the Deed, it uses the same format in which the Deed was written.

DRV, Section 3.2.2 (emphasis in original).  In addition, FSI agreed that:

>           all Non-US Patents Excluded Jurisdiction Non-US
>           Patents   Subsequent   Developments   Excluded
>           Jurisdiction Subsequent Developments Trade Marks
>           and Copyrights conveyed to it by Newcom . . . shall
>           be held by Funge Inc. upon and subject to the terms
>           of this Deed unless (in the case of a subsequent
>           conveyance) the terms of this Deed are by such
>           conveyance expressly excluded.

DRV, Section 5.

The Court finds it significant that the Deed of Rectification was not an arms-length transaction, given Newcom's ownership or control of all of the signatories.  As John Tucker, a lawyer for Newcom and the drafter of the Deed of Rectification, stated, the document was designed "to retain for Newcom a right to be reconveyed the [transferred] intellectual property as owner but to cause money payable for the acquisition of the intellectual property to go to FSIL" to avoid Newcom incurring unnecessary taxes.  Tucker Dep. at 13.

Around the time the Deed of Rectification was drafted, Benson anticipated that FSI would need to begin a new round of financing.  Benson feared, however, that third parties would not invest unless FSI owned assets, including the V-SIM patent application.  See Tucker Dep. at 19, 42-43.  To provide such assets, Benson and Newcom implemented a series of assignments to transfer the V-SIM patent application to FSI.  On September 6, 2000, Benson assigned his entire interest in the V-SIM patent

application to Newcom.  On September 25, 2000, Newcom assigned "the full and exclusive right, title and interest" in the V-SIM patent application to FSIL.  The document assigning title neither mentioned the Deed of Rectification nor indicated any cloud on FSIL's title to V-SIM.  This assignment was recorded with the PTO on a form stating that Newcom's "whole" interest was assigned.

On October 6, 2000, FSIL assigned "the full and exclusive right, title and interest" in the V-SIM patent application to FSI.  Using language identical to Newcom's assignment of the V-SIM patent application to FSIL, FSIL affirmed that it was "the owner of the entire right, title and interest" in the V-SIM patent application and agreed to protect FSI's full title to the application.[8]  In the Notice of Recordation submitted to the PTO, FSIL stated it was assigning its "whole" interest.  Again, neither the Notice of Recordation nor the assignment itself mentioned any pre-existing lien or other encumbrance on the V-SIM application.

In April 2001, outside investors successfully gained control of FSI's Board of Directors from Benson and Newcom through what plaintiff alleges, but has not established, was a fraudulent shareholder vote.  In May 2001, this group of shareholders formed Funge Merger Corporation ("FMC"), a Delaware corporation, which

---

[8]  Newcom had similarly agreed to protect FSIL's full title to the V-SIM patent application when it assigned its rights to FSIL.

was subsequently renamed Imbros Corporation ("Imbros"), the defendant in this civil action.  On May 18, 2001, FSI filed a Chapter 11 bankruptcy petition, and a trustee was assigned in January 2002.

On February 7, 2002, FSI's trustee notified Newcom and other parties that it planned to sell FSI's assets, which included the V-SIM patent application.  On March 15, 2002, the trustee filed a Motion to Authorize Sale of Assets of Debtor Free and Clear of Liens Out of the Ordinary Course of Business ("Motion to Authorize Sale").  This document and the accompanying Asset Purchase Agreement detailed FSI's assets, including the rights to the Card-Switch and V-SIM technologies in the United States, as well as rights to other domestic and international intellectual property.  The Motion to Authorize Sale listed two holders of security interests in FSI's assets: FMC, whose interest was to be satisfied by the sale's proceeds, and an unrelated third party, and stated that the sale "will be free and clear of all liens." Motion to Authorize Sale at ¶ 17.  Neither the Motion to Authorize Sale nor the Asset Purchase Agreement mentioned either the Deed of Rectification or any other potential encumbrance on the title to the V-SIM patent application.

On March 22, 2002, Newcom and Benson filed an opposition to the proposed sale of FSI's assets to FMC alleging that FMC had acted improperly by seeking to reorganize or dissolve FSI in a

manner favorable to FMC.  Although Newcom and Benson's opposition
also listed seven assets within FSI's estate that had not
previously been disclosed, neither this listing nor any other
contemporaneous pleading filed by Newcom or Benson mentioned the
Deed of Rectification or made any claim that Newcom, or even
FSIL, had any interest in, or right to, the V-SIM patent
application.

Newcom and FMC were the only parties to bid on FSI's assets,
and FMC submitted the higher bid.  By an Order entered on April
8, 2002, the bankruptcy court authorized the trustee to sell
FSI's assets to FMC "free and clear of all liens, claims and
encumbrances," pursuant to the terms of the Asset Purchase
Agreement, and found FMC to be a "good faith purchaser" of FSI's
assets.  4/8/02 Order at 2, 3.[9]  Both the bankruptcy court's

_____

[9]  Section 2 of the Asset Purchase Agreement states that the
sale was:

> free and clear of any and all liens, claims,
> security interests, collateral security agreements,
> deeds, deeds of trust, financing statements,
> mortgages, charges, pledges, proxies, voting trust
> arrangements, equitable interests, licenses,
> community property, interests, equitable interests,
> rights of first refusal or call, or similar
> encumbrances or restrictions of any kind or nature
> whatsoever, including, without limitation,
> restrictive covenants or restrictions on transfer
> of any nature whatsoever and any restriction on
> use.

Referring to the third-party security interest mentioned above,
Section 2 of the Asset Purchase Agreement provided that the "only
lien on assets already owned by FSI that has been asserted in

- 11 -

order and the Asset Purchase Agreement, however, conditioned the sale upon the assignment to, and assumption by, FMC of five contracts listed in Schedule B to the Asset Purchase Agreement. 4/8/02 Order at 2.  The second contract listed in Schedule B was the Deed of Rectification.[10]

On April 10, 2002, FMC formally purchased FSI's assets through a Bill of Sale and Assignment Agreement ("Bill of Sale"). In Section 3(a) of the Bill of Sale, FSI's trustee represented that it was transferring "all right, title and interest in and to the Assets, free and clear of any and all liens, charges, encumbrances, licenses, rights of third parties or claims of any nature."  Newcom did not appeal the bankruptcy court's decision or in any other respect alert the court, the trustee or defendant that it claimed to have an enforceable interest in the V-SIM application.

More than a year after the asset sale was consummated, on June 22, 2003, Newcom gave Imbros, as FMC's successor, notice that Newcom sought to exercise its right pursuant to Section 3.2.2 of the Deed of Rectification to require the reconveyance of

---

FSI's Case is that of Collison & Co., the patent attorneys for Benson and Newcom Companies.  This sale is free and clear of that lien."

[10]   The other contracts were a March 22, 2001 agreement between Newcom Technologies, Newcom, FSIL, FSI and Benson; the Principal Agreement; the Transfer Down Agreement; and the FSIL Transfer Down Agreement.

the V-SIM patent application to Newcom.  Imbros has refused to
honor that request.  On February 6, 2004, Newcom filed the
pending two-count Complaint against Imbros.  In Count I,
plaintiff alleges that defendant breached Section 3.2.2 of the
Deed of Rectification by not reconveying legal title of the V-SIM
patent application to Newcom.  For relief, plaintiff seeks a
declaration that Newcom is the proper owner of the V-SIM patent
application and an order requiring Imbros to convey its rights to
the V-SIM technology to Newcom.  Count II requests a preliminary
injunction.  On June 3, 2004, the Court ordered Imbros not to
transfer or otherwise encumber its rights to the V-SIM technology
until this civil action was resolved.  In its Answer, Imbros
filed a Counterclaim against Newcom requesting a declaration that
it owns the V-SIM patent free and clear of any claim by Newcom.

## DISCUSSION

   Plaintiff bases its claim primarily on the Deed of
Rectification, which plaintiff argues entitles Newcom to
reconveyance of the V-SIM patent.  According to plaintiff, FSI
could not sell defendant full and complete title to the V-SIM
application because FSI only held "bare" title to that property
subject to the terms of the Deed of Rectification, which required
FSI to hold the application in trust for FSIL and subject to
reconveyance to Newcom.  Plaintiff insists that the encumbrances
on V-SIM's title passed to defendant when the bankruptcy court

explicitly conditioned the purchase of FSI's assets on defendant assuming the Deed of Rectification.  Plaintiff argues that this requirement encumbered defendant's title to the V-SIM technology and entitles plaintiff to an order reconveying to it title to the V-SIM patent.

Defendant counters that the Deed of Rectification is so fatally flawed that it cannot provide grounds for specific performance.  Moreover, defendant contends that even if the Deed were comprehensible and enforceable, plaintiff transferred all its rights to this property when it assigned its title to the V-SIM patent application free and clear of any liens to FSIL, which then transferred those rights to FSI.  Lastly, defendant argues that the bankruptcy sale constitutes <u>res</u> <u>judicata</u> as to title issues and that plaintiff's failure to raise before the bankruptcy court its claim to a residual interest in V-SIM constitutes a waiver of that claim and equitably estops plaintiff from raising it in the instant action.

I.   <u>The Applicability of the Deed of Rectification</u>

Defendant correctly argues that the Deed of Rectification's imprecise language renders it so incomprehensible that it is incapable of providing the specific performance plaintiff seeks. Specific performance of a contract is only possible when a contract is complete, definitive and clear on its face.  "It is an elementary principle that a court of equity will not

- 14 -

specifically enforce a contract unless it be complete and certain.  All the essential terms of the contract must be finally and definitively settled.  None must be left to be determined by future negotiations."  Duke v. Tobin, 96 S.E.2d 758, 759 (Va. 1957); see also Porter v. Shaffer, 133 S.E. 613, 617 (Va. 1926) ("According to well settled principles, the contract, sought to be specifically executed, must be established by competent proofs *to be clear, definite and unequivocal in all its terms*.  If the terms are uncertain, ambiguous or not made out by satisfactory proofs, a specific performance will not (as, indeed upon principle, it should not) be decreed.") (emphasis in original) (quoting Pierce's Heirs v. Catron's Heirs, 23 Gratt. 588 (Va. 1873)); Coastland Corp. v. Third Nat'l Mortgage Co., 611 F.2d 969, 976 (4th Cir. 1979).

Although drafted by counsel, the Deed of Rectification is entirely lacking in basic clarity.  For example, there are no dates, either in the Deed's text or next to the parties' signatures, to establish when the Deed went into effect.  Some sections, such as Section 5,[11] include no punctuation, resulting in run-on prose more like that used by James Joyce in Ulysses than the style expected from lawyers drafting a document meant to govern complex business dealings.  Section 3, which is critical to plaintiff's argument that it retained an interest in the U.S.

---

[11] See text quoted at p. 8, supra.

V-SIM patent application, is inherently ambiguous.  In one subsection, Newcom agrees to convey its "whole" interest in certain assets to FSI, while in the next section, it retains a right to have those assets reconveyed.  The Deed of Rectification also references the Transfer Down Agreement as if it had gone into effect, when there is no evidence it had even been drafted.  Recital E(i) includes subsections (d) and (e), although there are no subsections (a), (b) and (c).  Although the Deed refers to a singular pending patent application, in fact, the applications for both Card-Switch and V-SIM were pending.  The use of confounding language and improper grammar and the lack of logical organization throughout the Deed is so pervasive as to support a conclusion that the poor draftsmanship was purposeful.  According to Kendrew Colton, counsel to FSI, Benson informed Colton that the Deed of Rectification was purposefully "designed to be difficult to follow" and that Benson "[could] say it mean[t] whatever [he needed] it to say."  Colton Dep. at 16.[12]  Yet, regardless of whether the Deed of Rectification's problems were intentional or inadvertent, simple edits, such as explicitly stating that the Deed governed V-SIM, could have clarified the issues presented to this Court four years later.

---

[12]  Benson is plaintiff's corporate representative and, therefore, his statement to Colton constitutes a party admission.

- 16 -

Because of this poor draftsmanship, the Court finds no support for plaintiff's argument that the Deed applies to the V-SIM patent application.  Plaintiff bases this argument on its claim that the V-SIM application qualifies as a Subsequent Development of the Card-Switch application.  According to Benson's declaration, the V-SIM patent application was a derivative of the Card-Switch application, and V-SIM could not operate without infringing upon the Card-Switch patent.  Consequently, as Section 3.2.2 of the Deed of Rectification provided for reconveyance of Subsequent Developments, plaintiff argues that it can now seek reconveyance of the V-SIM application from defendant.

Plaintiff's argument is without merit.  First, the Deed of Rectification provided a problematic definition of the term "Subsequent Development."  The definition contained the very term to be defined, creating a circularity that leaves the term amorphous and inoperable.  Second, the Deed defined a Subsequent Development as an instrument predicated upon a separate and distinct "US Pending Patent Application."  Given that the V-SIM patent application was pending when the Deed of Rectification allegedly was signed, the Court finds that the V-SIM patent application was a predicate pending patent application, which is not subject to reconveyance under Section 3.2.2.  Support for this finding comes from Tucker, the Deed's author, who wrote in a

- 17 -

February 16, 2001, memorandum that "[t]he V-SIM patent is not in fact a development of any of the claims contained in [the Card-Switch patent application] but is a different type of claim." Def. Ex. 18 at 2; see also Tucker Dep. at 58.  Although Tucker later admitted that he did not know whether this statement was accurate, the statement was consistent with information provided by Dr. John Hogarth, a Newcom official, and appears to reflect Newcom's understanding of the Deed's relationship to V-SIM, given Newcom's later silence at the bankruptcy sale, as discussed infra.  The Court finds further support for this conclusion from the fact that the V-SIM patent application was filed as a stand alone application and not as a divisional application or a continuation of the Card-Switch patent application.  For these reasons, there are no reasonable grounds upon which to find that the V-SIM patent application was a Subsequent Development of any pending patent application.

Even if the Deed applied to the V-SIM patent application, plaintiff's rights under the Deed of Rectification never went into effect because a necessary condition precedent did not occur.  Section 3.2.1 provides that FSI agreed to hold any Subsequent Developments transferred to it "as bare trustee for FSIL . . . **IF** [FSI] agrees to grant to Newcom a Non-Exclusive Licence of that Non-US Patent and Subsequent Development[.]" (Emphasis in original).  Plaintiff admits that a non-exclusive

- 18 -

license to Newcom was never issued but argues that this condition was "not material to the duty of FSI to reconvey the V-SIM patent rights." Pl.'s Brief at 9 n.3. Plaintiff's argument is utterly unpersuasive. The Deed of Rectification stresses the importance of this condition by underlining, bolding and capitalizing the word "if." The non-occurrence of such an emphatically highlighted condition precedent cannot be ignored. Moreover, given plaintiff's control over FSI, there is no reason why this condition precedent could not have been satisfied. Plaintiff has provided the Court with no basis upon which to read this clear condition precedent out of the document.

Plaintiff next argues that, under Virginia law, Section 3.2.1 of the Deed established an express trust in which assets FSI received were held for FSIL and were subject to reconveyance to Newcom. Plaintiff cites a single case, In re Dameron, 155 F.3d 718 (4th Cir. 1998), to support its argument that an express trust was created. However, the Fourth Circuit stated in that case that the words or circumstances generating such a trust must "unequivocally show an intention" that the trust be held by a single party for the benefit of another party. Id. at 722 (quoting Broaddus v. Gresham, 26 S.E.2d 33, 35 (Va. 1943)). No unequivocal expression of intent exists here. Rather, the unambiguous assignments of the V-SIM application free and clear of any encumbrance directly contradict the Deed of

Rectification's language that FSI would hold assets as "bare
trustee for FSIL as sole beneficial owner thereof."  Moreover, as
discussed above, the necessary precondition for an express trust
to arise -- FSI's grant of a non-exclusive license -- never came
to pass.  Finally, the instant action can be distinguished from
Dameron, in which the Fourth Circuit based its decision on the
key finding that the express trust at issue was established
during pending bankruptcy proceedings.  To the contrary, Newcom
never asserted a trust argument during FSI's bankruptcy
proceedings, but instead waited to raise the issue for the first
time in this litigation, well after the time to appeal the
bankruptcy court's decision had passed.  Accordingly, the Court
finds that plaintiff retained no rights to the V-SIM technology
under the Deed of Rectification.

II.  The Assignments of Title

In addition to finding that plaintiff has no recourse under
the Deed of Rectification, the Court finds, contrary to Newcom's
position, that the documentary evidence establishes an
unambiguous and continuous chain of complete and unencumbered
assignments of full title to the V-SIM patent application from
Benson to Newcom, Newcom to FSIL, and FSIL to FSI.  Nothing in
the language used in the three assignments indicates or suggests
any cloud on the title.

Plaintiff argues that reading these assignments merely

within their four corners would "ignore all aspects of the relationship of the parties and the transaction pursuant to which the assignments were made." Pl.'s Opp'n at 6. The assignments, plaintiff contends, can only be read within the larger context of the business arrangement established by the Deed of Rectification and related agreements.

Plaintiff's argument that the Deed of Rectification changed the nature of the assignments of title is contrary to well-established principles of contract interpretation. When the language of a written instrument like an assignment is clear on its face, parol evidence is not considered, and the document is read within its four corners. See 35 U.S.C. § 261 (treating patents as one would personal property); Utsch v. Utsch, 581 S.E.2d 507, 509 (Va. 2003) (quoting Pyramid Dev., L.L.C. v. D & J Assocs., 553 S.E.2d 725, 728 (Va. 2001)) (stating this proposition in regard to a deed of a marital residence).[13] A

─────────────

[13] The Virginia Supreme Court observed in Utsch that:

> If [there were no parol evidence rule], no lawyer would be safe in advising upon the construction of a written instrument, nor any party in taking under it; for the ablest advice might be controlled, and the clearest title undermined, if, at some future period, parol evidence of the particular meaning which the party affixed to his words, or of his secret intention in making the instrument, or of the objects he meant to take benefit under it, might be set up to contradict or vary the plain language of the instrument itself.

581 S.E.2d at 509-10 (quoting Richard A. Lord, Williston on Contracts § 33.1, at 556 (4th ed. 1999)).

court should not disrupt agreements whose terms are clearly and explicitly presented in a contract.  See Amos v. Coffey, 320 S.E.2d 335, 337 (Va. 1984).  The clarity of the V-SIM assignments, which state unambiguously that FSI received full title to the application, leaves no ambiguity requiring clarification from external documents.

As the drafter of the assignments, plaintiff is not prejudiced by being held to the explicit terms of the assignments.  Because FSIL and FSI were all controlled by Newcom and Benson, no obstacle prevented plaintiff from incorporating any additional terms, such as those in the Deed of Rectification, into the four corners of the assignments.  In fact, Benson has admitted that he was advised by counsel that to provide legal but not full title of V-SIM to FSI "would probably require a caveat to be lodged in respect of every patent application for the intellectual property."  6/28/01 Benson Decl. at ¶ 42; see also Tucker Dep. at 19 ("[Benson's] question to me was could he proceed under the Deed of Variation and Rectification [sic] to transfer the patent and my response was yes he could provided that it was made perfectly clear that Funge System, Inc [FSI] would be holding the property on the trusts of the Deed of Rectification.").  As the record clearly demonstrates, no such caveats were ever filed with the PTO, nor did plaintiff make any effort to amend its filings with the PTO as to the assignments

- 22 -

with the PTO.

Lastly, the Court finds that plaintiff's conduct before the PTO strongly undercuts plaintiff's eligibility for any equitable relief from this Court in the form of a declaratory judgment. Plaintiff's position that the assignments were subject to the undisclosed Deed of Rectification clearly would violate the duty of candor plaintiff owed the PTO.  In recording the V-SIM assignments with the PTO, Newcom and FSIL operated under a "duty to prosecute patent applications in the PTO with candor, good faith, and honesty."  Life Techs., Inc. v. Clontech Labs., Inc., 224 F.3d 1320, 1324 (Fed. Cir. 2000) (finding the submission of false material information or the failure to disclose material information, coupled with duplicitous intent, constitutes actionable inequitable conduct); see also 37 C.F.R. § 1.56(a) ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability[.]").  Thus, if the Deed of Rectification affected the assignment of title to the V-SIM patent application as plaintiff asserts, Newcom and FSIL were legally obligated to correct their submissions to the PTO and state that FSIL and then FSI possessed only a partial, not a whole, interest in the application.  Under similar facts, the Fifth Circuit invalidated

an unrecorded retention of patent rights by an assignor who simultaneously recorded a full and complete assignment of the same rights to the assignee.  See CMS Indus., Inc. v. L.P.S. Int'l, Ltd., 643 F.2d 289, 294-95 (5th Cir. 1981).  The CMS court found that failing to protect innocent purchasers of a recorded assignment would eviscerate 35 U.S.C. § 261's protections by enabling assignors to use hidden agreements to "hoodwink[] those desiring to learn from official records the true status of such ownership interests."  Id. at 295.  Plaintiff attempts to distinguish CMS by arguing that the Deed of Rectification's inclusion in the bankruptcy sale alerted defendant that Newcom had retained an interest in V-SIM.  As previously discussed, however, the ambiguity of the Deed could not have put defendant on actual or constructive notice of plaintiff's specific claim to the V-SIM application, and even if it did, plaintiff's intentional misrepresentation to the PTO would not be cured by what occurred in the bankruptcy proceeding.

III. Waiver and Res Judicata

The Court also finds that plaintiff's conduct before the bankruptcy court establishes that plaintiff waived any claim to title of the V-SIM application, and that the bankruptcy court's finding that defendant was a good faith purchaser of all the assets of FSI free and clear of any liens is res judicata.  Under 11 U.S.C. § 363(e), parties with an interest in property to be

- 24 -

sold as part of a bankruptcy sale may petition the bankruptcy court to protect their interests. Although Newcom filed an opposition to the proposed sale, it failed to alert either the bankruptcy court or FMC that it claimed to have an interest in the V-SIM patent application. When the bankruptcy court included the assumption of various contracts, including the Deed of Rectification, into the sale of FSI's assets, plaintiff's silence left the bankruptcy court unaware that plaintiff might exploit FMC's assumption of the Deed to undermine the intended goal of the bankruptcy sale to disburse FSI's assets free and clear of any encumbrances. This silence waived plaintiff's present claim to any residual interest in V-SIM.

Moreover, further litigation of this issue is barred under the doctrine of res judicata. See In re Varat Enterprises, Inc., 81 F.3d 1310, 1315 (4th Cir. 1996) ("The doctrine of res judicata applies in the bankruptcy context."). "[F]ederal courts have consistently applied res judicata principles to bar a party from asserting a legal position after failing, without reason, to object to the relevant proposed plan of reorganization or to appeal the confirmation order." Id. at 1315; see also In re Justice Oaks II, Ltd., 898 F.2d 1544, 1553 (11th Cir. 1990). To assert a valid claim of res judicata, a party must establish three elements: (1) a final judgment on the merits of the suit, (2) an identity of causes of action in both the earlier and the

later suits and (3) an identity of parties or their privies in
the two suits.  See Meekins v. United Transp. Union, 946 F.2d
1054, 1057 (4th Cir. 1991).

All three elements are present here and bar plaintiff from
litigating its claim of a residual right to the V-SIM patent
application.  The order of the bankruptcy court is a final
judgment with res judicata effect.  See Stoll v. Gottlieb, 305
U.S. 165, 170-171 (1938).  The causes of action are identical, as
they arise out of the same transaction or series of connected
transactions, specifically the transfer of the V-SIM patent
application to FSI and the conditions, or lack thereof, imposed
on FMC's ownership of V-SIM by the bankruptcy court.  See Harnett
v. Billman, 800 F.2d 1308, 1314 (4th Cir. 1986) (quoting
Restatement (Second) of Judgments § 24(1) (1982) to define the
standard for establishing the identity of cause of action prong).
Finally, both plaintiff and defendant were parties to the
bankruptcy sale during which plaintiff possessed, but did not
raise, its current claim.  To the extent that plaintiff was
confused about an inconsistency between the bankruptcy court's
decision to include the Deed of Rectification in the sale and the
court's order declaring that the sale was free of any liens or
encumbrances, plaintiff had an obligation to raise that issue
with the bankruptcy court or appeal the bankruptcy court's
decision to approve the sale as it did.  Failing to so alert the

bankruptcy court undermined the goal of the bankruptcy sale, which was to distribute the debtor's assets and liabilities with finality and clarity.  Again, Newcom's past inaction precludes it from litigating its present claim.

Lastly, the Court finds significant the bankruptcy court's conclusion that FMC was a "good faith purchaser."  4/8/02 Order at 3.  The Fourth Circuit has adopted the traditional equitable definition of a good faith purchaser as "one who purchases the assets for value, in good faith, and *without notice of adverse claims*."  Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985) (emphasis added).  Courts protect good faith purchasers from future claims to promote the finality of bankruptcy judgments and sales, as well as to enhance the value of a debtor's assets at a bankruptcy sale.  See, e.g., In re Stadium Management Corp., 895 F.2d 845, 847 (1st Cir. 1990).  "Finality is important because it minimizes the chance that purchasers will be dragged into endless rounds of litigation to determine who has what rights in the property."  In re Sax, 796 F.2d 994, 998 (7th Cir. 1986); see also In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir. 1986).

Relying on In re Signal Hill-Liberia Ave. Ltd. P'ship, 189 B.R. 648 (Bankr. E.D. Va. 1995), plaintiff responds that finding FMC to be a good faith purchaser is irrelevant, as defendant could not have purchased any greater rights to V-SIM than those

already possessed by FSI.  However, as the Court has already
found, plaintiff's arguments as to FSI's limited rights to the V-
SIM application are meritless.  Accordingly, plaintiff cannot
defeat the effect of the bankruptcy court's finding that
defendant was a good faith purchaser.

IV.  Equitable Estoppel

        Lastly, in pursuing a declaratory judgment, plaintiff
invokes the equitable powers of this court.  A party with unclean
hands can be equitably estopped from recovery.  See Food Lion,
Inc. v. S.L. Nusbaum Ins. Agency, Inc., 202 F.3d 223, 228 (4th
Cir. 2000) ("Unclean hands bars a party from receiving equitable
relief because of that party's own inequitable conduct.").  Even
if the Deed of Rectification were comprehensible and did
originally apply to the V-SIM patent application, plaintiff's
misconduct before the PTO and during the bankruptcy proceedings
renders it ineligible for the specific relief sought in this
litigation.  Under Virginia law, the doctrine of equitable
estoppel has four elements, each of which must be proved by clear
and convincing evidence: (1) a representation, (2) reliance, (3)
a change in position and (4) some detriment accruing to the
relying party.  See Dominick v. Vassar, 367 S.E.2d 487, 489 (Va.
1988) (quoting Lataif v. Com. Indus. Constr., Inc., 286 S.E.2d
159, 161 (Va. 1982)); see also In re Heritage Hotel Partnership
I, 160 B.R. 374, 378 (B.A.P. 9th Cir. 1993) (applying equitable

estoppel to bar assertion of claims after confirmation of Chapter 11 plan).  Equitable estoppel protects parties who rely in good faith upon the statements or actions, or even inaction, of another party by prohibiting the other party from benefitting by changing its position to contradict its earlier position or otherwise injure the relying party.  See American Sec. & Trust Co. v. Fletcher, 490 F.2d 481, 486 n.3 (4th Cir. 1974).  By failing to disclose its claim to the V-SIM application during the bankruptcy sale, Newcom intentionally misled defendant and the bankruptcy court into believing that it did not have an interest in V-SIM.  Defendant's estimation of an appropriate purchase price for FSI's assets was predicated in part upon plaintiff's misrepresentations about FSI's title to the assets.  According to Imbros's chairman, defendant would not have bid approximately one million dollars for FSI's assets had it known of any cloud on the title to the V-SIM patent application.  Porges Dep. at 19.  To disrupt defendant's well-grounded understanding that it owns the V-SIM patent free and clear of any encumbrance would substantially and inequitably harm defendant.

## CONCLUSION

For the reasons stated above, plaintiff's Motion for Summary Judgment will be denied, defendant's Motion for Summary Judgment will be granted, and the order entered by this Court on June 3, 2004, prohibiting defendant from transferring or encumbering the

- 29 -

V-SIM technology will be vacated forthwith by an Order filed with this opinion.

      Entered this 6th day of May, 2005.


                                    _____/s/_____
                                    Leonie M. Brinkema
                                    United States District Judge

Alexandria, Virginia_____